# Exhibit 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re VEECO INSTRUMENTS, INC. SECURITIES LITIGATION | ) ) ) ) ) | Case No.: 7:05-md-1695 (CM) |

## EXPERT REPORT ON DAMAGES AND LOSS CAUSATION
## PREPARED BY
## STEVEN P. FEINSTEIN, PH.D., CFA
## MARCH 23, 2007

## SCOPE OF PROJECT AND REPORT

I have been asked by counsel for the lead plaintiff, the Steelworkers Pension Trust, to determine whether or not the fraud alleged in the Consolidated Amended Class Action Complaint ("Complaint") caused class members to suffer losses on their investments in the stock of Veeco Instruments, Inc. ("Veeco" or the "Company") purchased during the class period, 26 April 2004 through 10 February 2005. I was asked also to estimate the magnitude of the damages caused by the alleged fraud on a per share basis if in fact losses could be determined with a reasonable degree of statistical certainty to have been caused by the alleged fraud.

Toward this end, I analyzed information disseminated by the Company, press releases, conference call transcripts, equity analyst reports covering Veeco, news articles, SEC filings (including restated financials), the performance of Veeco stock, the performance of the overall stock market and the stock of Veeco's peers, as well as other pertinent data and documents. Exhibit-1 lists the data and documents I reviewed and relied upon in the course of this engagement.

This report presents my methodology, findings, and conclusions.

I understand that discovery in this case is still in progress. I may revise my analyses and report as additional information becomes available. Specifically, but without limitation, I reserve the right to supplement my report with respect to any issue regarding the reporting periods covered by the financial data in the Company's forms 10-Q filed with the SEC during 2004.

## CREDENTIALS

I, Steven P. Feinstein, am an Associate Professor of Finance and the holder of the Donald P. Babson Chair in Applied Investments at Babson College. I am the Faculty Director of

1

the Stephen D. Cutler Investment Management Center at Babson College, a research and education center dedicated to the study and teaching of investments and capital markets. I am also the Director of the Babson College Fund, an academic program in which selected students manage a portion of the Babson College endowment under my supervision.

I have a Ph.D. in Economics from Yale University, a Master of Philosophy degree in Economics from Yale University, a Master of Arts in Economics from Yale University, and a Bachelor of Arts degree in Economics from Pomona College. I also hold the Chartered Financial Analyst ("CFA") designation, granted by the CFA Institute (formerly known as the Association for Investment Management and Research).

At Babson College I have taught undergraduate and MBA level courses in Valuation, Investments, Financial Management, Equity Analysis, Fixed Income Analysis, Risk Management, and Quantitative Methods. I have also taught executive courses on corporate financial management for numerous corporations. Other courses I have taught are listed in my curriculum vitae, which is attached as Exhibit-2. Prior to my joining the faculty at Babson College, I taught finance at Boston University. Prior to that I was an Economist at the Federal Reserve Bank of Atlanta where my primary responsibilities were to monitor financial markets, analyze proposed regulation, and advise the Bank President in preparation for his participation in meetings of the Federal Open Market Committee – the government body responsible for monetary policy in the United States.

I have published extensively in the field of finance. My finance articles have appeared in *The Journal of Forensic Economics, Atlanta Federal Reserve Bank Economic Review, Derivatives Quarterly, Derivatives Weekly, The Engineering Economist, The Journal of Risk, The American Bankruptcy Institute Journal, The Journal of Financial Planning, Risk Management,* and *Primus*. I am the author of *Finance and Accounting for Project Management*, published by the American Management Association. I wrote two chapters in the best-selling book *The Portable MBA in Finance and Accounting* -- one on

2

corporate financial planning and the other on risk management. I have presented research at the annual conventions of the American Finance Association, the Academy of Financial Services, the Multinational Finance Society, the Financial Management Association, and the International Conference on Applied Business Research. Co-authored papers of mine have been presented at the Eastern Finance Association meetings and the Midwestern Finance Association meetings.

I have been selected to review papers for numerous finance journals and conferences, and I have reviewed finance textbook manuscripts for Prentice-Hall and Southwestern Publishing. I have been quoted on matters relating to finance and investments in the *Wall Street Journal*, *The Washington Post*, *The New York Times*, and *The Boston Globe*, and my research relating to financial analysis and valuation has been discussed in *Bond Buyer* and *Grant's Municipal Bond Observer*.

I am a member of the American Finance Association, the Financial Management Association, the North American Case Research Association, the CFA Institute, and the Boston Security Analysts Society, where I have served as a member of the education committee and ethics subcommittee. I served on the Fixed Income Specialization Examination Committee of the CFA Institute.

The CFA designation is the premier credential for financial analysts, worldwide. In order to receive this credential, applicants must pass a series of three exams covering such topics as equity analysis, financial valuation, business analysis, quantitative estimation methods, investment analysis, portfolio management, risk management, financial accounting, and ethical and professional standards. I have taught in the Boston University CFA Review Program and the Boston Security Analysts Society CFA Review Program -- two of the leading review programs that help candidates prepare for the CFA exams. In both of these programs I taught the most advanced level.

In addition to my teaching, research, CFA, and academic community responsibilities, I

practice extensively as a financial consultant. Past and present clients include the United States Securities and Exchange Commission, the Internal Revenue Service, the Attorney General of the State of Illinois, the National Association of Securities Dealers, Lucent Technologies, Travelers Insurance, Bankers Trust, Lehman Brothers, and State Street Bank. As a financial consultant, I have estimated damages in approximately 50 lawsuits. Exhibit-3 lists my prior testimony appearances over the past five years.

## CONCLUSIONS

1.  Based on an event study focusing on the market's reaction to the Company's 11 February 2005 announcement that the Company would restate earnings for the previous three quarters, in which announcement the Company also estimated the magnitude of the restatement, I have determined with a reasonable degree of statistical certainty that the Company's misrepresentations relating to earnings over the previous three quarters had caused the price of Veeco stock to be artificially inflated during the class period.

2.  Based on the same event study, I have determined that the corrective disclosure on 11 February 2005 caused the price of Veeco stock to fall $3.22 per share, thereby causing class members who had purchased the stock at artificially inflated prices to suffer substantial losses on their investments in Veeco stock.

3.  Based on a model that attributes the price inflation proportionately to the amount of pre-tax earnings overstatement reported, I estimated that Veeco stock was inflated by amounts ranging from $0.88 per share to $3.22 per share over the class period.

4.  As of the date of this report, prejudgment interest, computed at an assumed statutory 6% simple interest rate, amounts to a minimum of 11.2% for class members who suffered damages.

4

## ABOUT THE COMPANY

5.  Veeco is in the business of designing, manufacturing, marketing, and servicing high technology precision process and metrology equipment. The Company's customer base is global and is diversified across companies in the data storage, semiconductor, telecommunications, lighting, and research industries. Veeco's customers use the Company's products to manufacture and test microelectronic products.

6.  The Company operates facilities in the United States, Europe, and Asia.

7.  The equity research company Needham and Company described Veeco's position as dominant in the business of producing the equipment necessary to manufacture recording heads:

    > "Veeco has multiple equipment lines that cover the majority of the steps used in the manufacture of recording heads, allowing it to dominate the market."
    > **"Veeco Instruments (VECO/NASDAQ), Lighting the Way Into a Smaller World: Initiating Coverage," equity analyst report on Veeco, by Robert Maire, Needham and Company, 19 May 2004, page 2.**

8.  Veeco acquired the TurboDisc division from Emcore Corporation in November 2003. With the acquisition, Veeco obtained MOCVD (Metal Organic Chemical Vapor Deposition) technology, which together with the Company's existing MBE (molecular beam epitaxy) technology are the two key epitaxial deposition technologies used for wireless and HB-LED (high brightness light-emitting diode) applications. These technologies are used to grow compound semiconductor materials at the atomic scale. As described by the Company in the conference call on 3 November 2003 announcing the acquisition, "Epitaxy is the critical first step in compound semiconductor wafer fabrication and is considered to be the highest value added process, ultimately determining device functionality and performance."

9.  In its year 2004 10-K, filed on 16 March 2005 (inclusive of the restatements), Veeco

reported revenues of $390.4 million, gross profit of $151.8 million, and income before interest, taxes and amortization of $6.9 million. Earnings excluding "certain charges" (those charges being charges and expenses for amortization, asset impairment, inventory write-off, merger and restructuring, purchase accounting adjustments, and write-off of purchased in-process technology) were reported by the Company to be $3.518 million in 2004, equivalent to a profit of $0.12 per share for the year.

10. On 26 April 2004, the first day of the class period, the closing Veeco stock price was $26.74 per share and according to data provided by Bloomberg, the Company's market capitalization stood at $792.0 million.[1] According to the Ibbotson Associates 2005 Yearbook, this market capitalization placed Veeco in the 7th decile by size among companies listed on the New York Stock Exchange, American Exchange, or NASDAQ, meaning that 60% of all other listed companies were larger than its decile while 30% were smaller.

11. On 10 February, 2005, the last day of the class period, Veeco's stock price was $18.86 per share and the Company's market capitalization was $560.74 million.[2] By the close of trading on 14 February 2005, two trading days after the corrective disclosure that ended the class period, the stock price had fallen to $16.20 per share, giving the Company a market capitalization of $481.66 million.

## IMPORTANT EVENTS

### Announcement of Q1 2004 Financial Results

12. On 26 April 2004, before the markets opened, Veeco announced its financial results

---

[1] Market capitalization is the total market value of the company's outstanding shares, and is computed by multiplying the number of shares outstanding by the market price per share. According to its first quarter 2004 10-Q, filed on 3 May 2004, Veeco had 29,630,153 shares outstanding as of the close of business on 27 April 2004, the day after the start of the class period.
[2] Market capitalization data was obtained from Bloomberg.

for the first quarter of 2004.  The Company announced that net sales in the quarter were $94.487 million, gross profit was $39.838 million, operating income was $1.071 million, earnings excluding certain charges was $3.423 million, and that per share earnings excluding certain charges was $0.11.

13. While Q1 2004 reported revenue and earnings were better than analysts had expected, a decline in gross margins and guidance disappointed analysts and investors:

> "Reported results were ahead of expectations as better revenue growth drove higher earnings.  Gross margins were clearly a disappointment as they declined despite a 23% increase in revenues.
> …
> "Guidance below street expectations (upper end of EPS at $0.14 vs consensus of $0.17) combined with gross margin issues in the near term quarters is likely to pressure stock despite a faster than anticipated acceleration in the top line."
> **"Veco: Strong Quarter, Guidance Light," analyst report on Veeco, by Glen Yeung, Smith Barney Citigroup, 26 April 2004.**

## Announcement of Q2 2004 Financial Results

14. On 26 July 2004, before the markets opened, Veeco announced its financial results for the second quarter of 2004.  The Company announced that net sales in the quarter were $102.884 million, gross profit was $45.343 million, operating income was $4.696 million, earnings excluding certain charges was $4.571 million, and that per share earnings excluding certain charges was $0.15.

15. Again, while Q2 2004 reported earnings and revenue exceeded analysts' expectations and Company guidance, concerns about profit margins and future guidance tempered analysts' outlook:

> "The company beat our revenue and earnings estimates and those of the street with revenues of $102.9M compared to our $98.3M

estimate. EPS came in at $0.15 per share versus our estimate of
$0.13.
...
"Veeco reported second quarter results with orders, revenue and
earnings all exceeding the company's guidance as the company's
diverse markets continue to reflect the strong demand from
semiconductor, compound semiconductor and data storage
customers."
**"Veeco Instruments (VECO/NASDAQ), A Company of Many Colors (All
Green)," equity analyst report on Veeco, by Robert Maire, Needham and
Company, 26 July 2004.**

"We are maintaining our Hold rating on Veeco Instruments and
raising our 2005 price target to $27 from $25 based on a 4x
multiple on estimated 2005 gross profits of $6.70 a share. The
[company] reported in-line second quarter results with a small
gross margin improvement. However, its third quarter guidance is
below our previous estimate and gross margins are expected to
remain under pressure throughout 2004. … In our opinion,
improved gross margins are the one factor required to generate
increased investor interest in the shares."
**"Veeco: Reports In-Line Q2; Q3 Guidance Soft, Q4 Better," analyst report
on Veeco, by Gerald S. Fleming, WR Hambrecht, 26 July 2004.**

## Reiteration of Results and Guidance

16. On 8 September 2004, Veeco CEO Edward Braun and CFO John (Jack) Rein spoke
at the Smith Barney Citigroup Technology Conference. They commented positively
on the Company's performance in the current year and offered optimistic projections
for the rest of the year:

> "Edward Braun: 'In terms of where we are in this recovery, this is
> clearly a very high growth year both in orders, revenue and
> EBITDA for Veeco. In the June quarter, we had 124 million of
> orders, up 100% compared to three quarters ago. Revenue, which
> lags orders of course, is up 50% -- I'm sorry -- up 100% compared
> to three quarters ago. Revenue which lags orders, of course, is up
> 50% over the last three quarters, and EBITDA is tripled over the
> three quarters. Our backlog increased in the June time frame to
> $164 million. Most of the analysts covering Veeco have us at

about $415 million in revenue this year, up nearly 50%.'
...
"Jack [Rein]: 'Overall on our guidance we see continued revenue
growth for Veeco in this September quarter and for the remainder
of 2004. Strong backlog enables the initial look at Q4. For Q3,
orders guidance is the range of 125-130 million. Revenues in the
range of 105-110 million. Earnings per share excluding
amortization in the range of 15-18 cents per share. GAAP EPS of
1.4% per share. Q4 revenues in the range of 115-125 million.
Earnings per share excluding amortization in the range of 29-34
cents a share, and GAAP EPS of 20-25 cents a share.'"
**"Veeco Instruments Inc. at Smith Barney Citigroup Technology
Conference (final transcript)," Fair Disclosure Wire, 8 September 2004.**

## Profit Warning and Announcement of Q3 2004 Financial Results

17. A little more than a month later, after the close of trading on 12 October 2004, the
    Company issued a press release warning that results for third quarter 2004, a quarter
    which was by then completed but not yet reported, would be below previous
    guidance. The warning announced that preliminary results for Q3 sales were
    approximately $93 million, lower than the previous year and lower than the previous
    guidance range of $105 million to $110 million. Orders in the quarter were expected
    to be $80 million, far below the previous estimate of $125 million to $130 million.
    Orders for MOCVD equipment had declined 70% sequentially. Q3 EPS excluding
    charges was estimated to be between 4 and 6 cents per share, well below the guidance
    of 15 to 18 cents. The Company also projected that Q4 sales would be between $90
    million and $100 million.

18. Veeco's stock price fell 10.78% (on a logarithmic return basis) on the next trading
    day and fell another 9.13% the day after that. Controlling for market and peer group
    effects, both returns were statistically significant.

19. On 25 October 2004, Veeco announced its financial results for the third quarter of
    2004, which were close to the numbers provided in the warning two weeks earlier.

9

The Company announced that net sales in the quarter were $92.367 million, gross profit was $38.733 million, the operating loss was $412 thousand, earnings excluding certain charges was $3.924 million, and that per share earnings excluding certain charges was 5 cents.

20. The financial results reported on 25 October 2004 were in line with the warning and revised guidance provided on 12 October 2004, and the stock actually rose a statistically non-significant 1.73% that day (on a logarithmic return basis).

## Announcement of Improper Accounting Transactions

### Press Release

21. On 11 February 2005, prior to the market's open, Veeco issued a press release announcing that it had "discovered improper accounting transactions" and would "postpone the release of audited results for the fourth quarter and full year 2004 pending completion of an internal investigation of improper accounting transactions at its TurboDisc division."

22. The Company announced that it expected to restate the financial statements for Q1, Q2, and Q3 of 2004, and that it expected pre-tax earnings for those quarters to be restated downward by $5.5 million to $7.5 million.

23. The Company bundled the disclosure of the improper accounting and likely restatements with several other statements, which generally were positive news, benign, or reiteration of old news.

24. The 11 February 2005 press release also announced that fourth quarter 2004 revenue would be between $93 and $100 million, in line with previous guidance.

25. The press release announced that fourth quarter 2004 orders were $99 million, which was better than the previous guidance range of $85 million to $95 million.

26. The press release reiterated "previously announced" information about a "pre-tax charge in the fourth quarter related to staffing and cost reductions and product rationalization costs and an in-process R&D write-off related to the acquisition of MTI."

27. The press release also announced that "Veeco will record in the fourth quarter of 2004 a non-cash valuation allowance of approximately $50 million related to its deferred tax assets." The press release added, "This adjustment will have no impact on the Company's cash flow or future prospects, nor does it diminish the Company's ability to utilize the underlying tax net operating loss and credit-carry forwards in the future." The press release explained that this accounting adjustment is dictated primarily by "current and previous operating performance".

28. The press release also offered first-time sales and order guidance for the first quarter of 2005, both in the range of $85 million to $90 million.

Conference Call

29. In Veeco's analyst conference call on 11 February 2005, the Company offered more details about the improper accounting and likely restatements. The improper accounting masked higher costs. With the restatements, the profit margin at the TurboDisc MOCVD division would be lower. As noted above in the quote from WR Hambrecht analyst Gerald Fleming's 26 July 2004 analyst report, and as seen in analysts' questions and comments during the conference call, profit margin was a key area of concern for analysts and investors.

> Edward Braun: ... But when restated, it means that our cost structure for that previous period was in fact higher. And we must

Case 1:05-cv-07446-CM    Document 120-2    Filed 06/13/2007    Page 14 of 36

be more aggressive in cost control and cost reduction."
**Preliminary Transcript of Veeco Instruments Inc. Earnings Conference Call, Thomson StreetEvents, 11 February 2005.**

Mark Petkun: ... And then looking at the gross margin profile I know when you acquired this business [TurboDisc, MOCVD] they were running below 40 percent gross margin, or close to that, obviously on a much lower revenue. If you can kind of back out all of the things you're looking at over the course of this year, what can we understand kind of as the baseline gross margin when we think of the MOCVD business for 2004?

John Rein, Jr: 2004 or 2005? 2004, after these adjustments we're going to be seeing gross margins in MOCVD that are in the mid-30s.

Mark Petkun: On what was a record revenue year?

John Rein, Jr: Right. And it needs to be in the mid-40s. So the task ahead of us is to bring those mid-30s to mid-40s.
**Preliminary Transcript of Veeco Instruments Inc. Earnings Conference Call, Thomson StreetEvents, 11 February 2005.**

Tim Acurie: ... Can I better understand what the issues were in the MOCVD division? It sounds like there were some labor costs that were being capitalized versus expensed, as well as some improper inventory evaluation? Is that the right way to think about it?

Edward Braun: That is correct.

Tim Acurie: Was the kind of capitalization of the labor component, is that something that as it was occurring was it something that was not – obviously it wasn't caught, but was it something that was not --?

John Rein, Jr: It was masked. Let me leave it at that. We have an investigation ongoing, so I can't do any further than said that it was masked and not apparent.
**Preliminary Transcript of Veeco Instruments Inc. Earnings Conference Call, Thomson StreetEvents, 11 February 2005.**

12

John Rein, Jr: '… I would say that probably 70 percent of the adjustment we're talking about currently looks to be in the inventory category, 70, 75 percent."
**Preliminary Transcript of Veeco Instruments Inc. Earnings Conference Call, Thomson StreetEvents, 11 February 2005.**

John Rein, Jr: ' … the examination, while it is not primarily focused in revenue, includes the looking at some revenue items."
**Preliminary Transcript of Veeco Instruments Inc. Earnings Conference Call, Thomson StreetEvents, 11 February 2005.**

Analyst Reaction

30. In reaction to the press release and conference call, the WR Hambrecht analyst lowered his price target for Veeco, citing the "accounting irregularities" and the reduction in earnings per share attributable to the likely restatements. The analyst cut his price target even while noting that first quarter 2005 revenue guidance was in line with his prior estimate, and that sales were strong in the Q4 2004:

> "Investment Conclusion: Following only the partial release of Q4:04 financials this morning due to accounting irregularities at an acquired process equipment business, we are lowering our 12-month price target on Veeco Instruments to $16 (from $22) but maintaining our Hold rating. … Nevertheless, the company's Q4 bookings soared 25% sequentially on the back of strong demand from the data storage industry bucking the semiconductor equipment industry trend where companies have reported order declines of about 10% in the December quarter. However, we remain concerned about the company's profitability and its ability to file, next month, audited financial statements while complying with Sarbanes-Oxley requirements. As a result, we believe that the stock may experience further weakness in the near-term.
> …
> "TurboDisc restatement may shave $0.14 off EPS for the first nine months of 2004. Veeco expects to restate pretax earnings for the nine months ending September 2004 down by $5.5-$7.5 million as a result of this investigation. Midpoint of this range would push 9M:04 pro forma EPS down from $0.31 to $0.17.
> …
> "With management guiding Q1 revenue at $85-$90 million, we are

13

leaving our revenue estimate unchanged at $89 million but
adjusting our EPS estimate down slightly to $0.08 (from $0.09)."
**"Veco: Cutting Price Target On Near-Term Uncertainty," analyst report
on Veco, by Gerald S. Fleming, WR Hambrecht, 11 February 2004.**

31. D. A. Davidson & Company analyst Matthew Petkun concurred that gross margins in

the TurboDisc division were overstated due to the accounting problems and this was

cause for some concern. In light of the new information, Mr. Petkun lowered his top-

line sales estimate for 2005 by only one-half of 1% (from $378 million to $376

million), but lowered his bottom-line EPS estimate for the year 19% (from $0.68 per

share to $0.55 per share):

> "The biggest change to our assumptions is in Veeco's Turbodisc
> business, the source of the accounting woes. Gross margins for
> these products was overstated in 2004, and requires adjustment.
> Management is redesigning its MOCVD tools, and restructuring
> operations in this unit, hoping to recapture margin in this business
> over the course of 2005. For Q4 we are maintaining our $96
> million estimate but reducing our pro forma EPS estimate from
> $0.10 to $0.04. For 2005, we are reducing our sales estimate from
> $378 million to $376 million and cutting our EPS estimate from
> $0.68 to $0.55."
> **"Veeco Instruments: Accounting Errors Overstate Gross Margin, Reducing
> Estimates, Data Storage Business Improving, Maintaining Buy Rating,"
> equity analyst report on Veeco, by Matthew Petkun, D. A. Davidson &
> Company, 11 February 2005.**

32. In an analyst report dated 11 February 2005, Smith Barney Citigroup analyst,

Timothy Arcuri, noted that the Company's first quarter 2005 revenue and orders

guidance were higher than what his own model was predicting:

> "FQ:05 (Jan) revenue and orders were guided to a range of $85-
> 90MM, better than our model for revenue of $86MM and orders of
> $83MM."
> **"Veco: LED Not So Bright," analyst report on Veeco, by Timothy Arcuri,
> Smith Barney Citigroup, 11 February 2005.**

33. While Mr. Arcuri initially held his own rating and price forecast fixed on the basis of

14

the restatements affecting costs rather than revenue, and because his investment thesis emphasized sales growth, he did acknowledge the accounting problem would likely hurt the stock:

> "… it is difficult to defend a stock after an accounting issue, and it will likely impact estimates …"
> **"Veco: LED Not So Bright," analyst report on Veeco, by Timothy Arcuri, Smith Barney Citigroup, 11 February 2005.**

34. On the next trading day, Monday, 14 February 2005, Mr. Arcuri lowered his risk rating of Veeco on the basis of the accounting problems disclosed the previous trading day (Friday, 11 February 2005):

> "In light of the delay in reporting full FQ4:04 (Dec) due to accounting irregularities at its TurboDisc division, we are lowering our risk rating on the stock from High to Speculative."
> **"Veco: Lowering Our Risk Rating," analyst report on Veeco, by Timothy Arcuri, Smith Barney Citigroup, 14 February 2005.**

35. Also equity analyst JoAnne Feeney of Punk Ziegel & Company lowered her rating on Veeco on 14 February 2005, citing the Company's accounting problems and the higher costs and reduced profitability indicated by the likely restatement figures:

> "We are lowering our rating on Veco from BUY to MARKET PERFORM following management's announcement of an internal investigation of accounting practices at its TurboDisc division and a delay in filing fourth quarter and full year results for 2004.
>
> "While we have no reason at this time to believe the accounting problem is more widespread, the preliminary results of the inquiry suggest materially higher manufacturing costs in the TurboDisc division. As a consequence, we have lowered our estimates of VECO's profitability and have incorporated the additional uncertainty associated with this division's profitability."
> **"Reducing Rating to Market Perform and Price Target to $18: TurboDisc Profitability In Question," analyst report on Veeco, by JoAnne Feeney, Punk Ziegel & Company, 14 February 2005.**

15

36. Ms. Feeney also lowered her price target on the Company from $25 per share to $18.

37. Needham and Company analyst Robert Maire published an analyst report on Veeco
on 14 February 2005. In his analyst report, Mr. Maire explained that the significance
of the accounting issues was that they concealed a deeper problem -- the
unprofitability of the TurboDisc MOCVD division. Mr. Maire concluded that the
accounting problem and the deeper profitability problem "diminish the value of the
acquisition (TurboDisc)", and reduce the overall valuation of Veeco:

> "If it were just a an accounting issue it would be less of a problem
> but the investigation into the improper accounting revealed that the
> MOCVD division has not been profitable even as the revenue run
> rate doubled from $35M to $70M. The accounting issue is
> relatively easily fixed by getting rid of the people who caused the
> problem and moving the division onto the standard company wide
> SAP. The issue of the division being unprofitable is a more "core"
> issue that needs to be resolved through cost cuts, potential
> restructuring, changes in business practices etc. Whereas
> accounting issues can be fixed relatively quickly, business issues
> take longer.
>
> "Unfortunately the MOCVD division has been the source of two
> major "oops" in less than six months. First an unanticipated drop in
> orders followed by this quarters problems. Though we agree with
> the long term strategy of the acquisition, the problems seem to
> diminish the value of the acquisition substantially and probably
> have dealt a setback to the longer term valuation of Veeco due to
> these "misses".
> **"Veeco Instruments (VECO/NASDAQ), One Problem Leads to Another,"**
> **equity analyst report on Veeco, by Robert Maire, Needham and Company,**
> **14 February 2005.**

38. Mr. Maire noted that the Company's news about orders was good, but was
outweighed by the negative news:

> Though the positive order momentum is good it is unfortunately
> dwarfed by the bad news in the quarter.
> **"Veeco Instruments (VECO/NASDAQ), One Problem Leads to Another,"**
> **equity analyst report on Veeco, by Robert Maire, Needham and Company,**
> **14 February 2005.**

39. The analyst reaction to the news about the accounting problems and restatements was highly negative and extended over the two trading day period of 11 February 2005 through 14 February 2005.

Market Reaction: Stock Price Decline and Elevated Trading Volume

40. From the previous day's closing price of $18.86 per share, the price of Veeco stock fell 10.1% (on a percent price change basis) on 11 February 2005 to close at $16.96. As shown formally below, this decline is statistically significant.

41. Veeco's trading volume on 11 February 2005 was 5,679,122 shares. The average daily trading volume over the class period and preceding year was 521,379 shares (with a standard deviation of 308,721 shares). The volume on 11 February 2005 was more than 10 times the average.

42. On the next trading day, 14 February 2005, Veeco stock continued to fall, declining another 4.5% (on a percent price change basis) to close at $16.20. Volume that day, at 1,430,713 shares, was 2.7 times the average volume and statistically significantly greater than the average volume.

43. Veeco stock fell on each of the next three trading days as well on above average volume each day, resulting in a five-day uninterrupted slide. After recovering 14 cents per share on 18 February 2005, the stock fell three more days in a row.

**Restated Financials Filed**

44. On 16 March 2005, Veeco formally restated its financial results for the first three quarters of 2004.

45. According to the restatement, in the first quarter of 2004, net sales were $90.863

17

million, $3.624 million less than previously stated. Gross profit was $36.798 million, $3.040 million less than previously stated. Instead of an operating profit of $1.071 million as had been previously reported, there was actually an operating loss of $1.729 million, which was a reduction in operating income of $2.800 million. Pre-tax loss was $3.928 million, $2.800 million worse than the previously stated pre-tax loss of $1.128 million.

46. According to the restatement, in the second quarter of 2004, net sales were $99.246 million, $3.638 million less than previously stated. Gross profit was $40.915 million, $4.428 million less than previously stated. Operating income was $0.420 million, which was $4.276 million less than previously stated. Pre-tax income was $4.276 million less than previously stated, resulting in a loss of $1.819 million instead of a profit of $2.457 million.

47. According to the restatement, in the third quarter of 2004, net sales were $97.367 million, $5.000 million more than previously stated. Gross profit, however, restated at $35.454 million, was $3.279 million less than previously stated. The operating loss was $3.542 million, which was $3.130 million worse than previously stated. Pre-tax loss was $5.335 million, $3.130 million worse than the previously stated pre-tax loss of $2.205 million.

48. For the three quarters cumulatively, gross profit was $10.747 million less than previously reported. Operating income was $10.206 million less than previously reported, resulting in a loss over the three quarters of $4.851 million instead of a profit of $5.355 million. The pre-tax loss was $11.082 million, which was more than 12 times worse than the previously reported pre-tax loss of $876 thousand over the period.

49. While the reduction to pre-tax profit anticipated as of 11 February 2005 was $5.5 million to $7.5 million, the actual reduction was $10.206 million.

## LOSS CAUSATION

### Event Study

50. I conducted an event study to determine whether the price of Veeco stock declined by statistically significant amounts on 11 February 2005 and 14 February 2005.

51. I examined the two trading days after the corrective disclosure because analysts published their reactions to the 11 February 2005 announcement over those two days, and also because trading volume in Veeco stock was significantly elevated over both of those days.

52. An event study measures how much of a stock price change cannot be explained by market and peer group factors, and tests whether or not the residual stock price movement can reasonably be explained as a random fluctuation.

53. If the stock return over an event period is statistically significant, it means that the stock price movement cannot be attributed to market and peer group factors, or to random volatility, but rather was likely caused by company-specific information.

### Regression Model

54. To determine how Veeco stock typically behaved in relation to the overall stock market and its peer group, I ran a regression modeling the return of Veeco stock as a function of: 1) a constant term, 2) the returns of the overall stock market, and 3) a peer group index return.

55. For the overall stock market factor I used the Standard and Poor's 500 Total Return Index ("S&P 500 Index"), which is a generally accepted and widely used measure of the overall stock market performance.  The S&P 500 Total Return Index

19

appropriately incorporates payment of dividends by the constituent companies.

56. For the peer group index, I used the same comparable companies that Veeco itself selected as appropriate peers. In Veeco's 2005 Proxy Statement dated 28 April 2005, the Company compared its stock performance to the performance of a "peer group index" composed of the following companies: ADE Corporation, ASM International, Axcelis Technologies, FEI Company, FSI International, Mattson Technology, Rudolph Technologies, Semitool, Therma-Wave, Trikon Technologies, Varian Semiconductor Equipment Associates, and Zygo Corporation.

57. While the Company proxy statement did not indicate how the comparable companies were consolidated into a peer group index, I applied the methodology generally applied by Standard and Poor's in the construction of its indices – specifically, I constructed a value-weighted index of the constituent companies. Each trading day's return for the peer group index is the value-weighted average of the constituent company returns.

58. All peer company data was obtained from Bloomberg, except the price and market capitalization data for Trikon Technologies, which were obtained from Capital-IQ, which in turn sources FT.com. Historical data for Trikon Technologies were not available from Bloomberg because the company has since been acquired.

59. Stock prices, trading volume and returns for Veeco are shown in Exhibit-4. The returns of the S&P 500 Total Return Index and the composite peer group index are presented in Exhibit-5. Exhibit-6 displays the data used to construct the peer group index.

60. Neither Veeco nor any of the peer group constituent companies paid dividends during the period analyzed for the event study.

61. I ran the regression on daily data covering the period 25 April 2003 through 23 April 2004.  This period is the full year prior to the class period.  This choice of control period is widely used and generally accepted in event studies.

62. All returns used in the regression are logarithmic returns – that is, the natural logarithm of the ratio of the current day's closing price to the previous day's closing price.  Logarithmic returns are commonly used in event studies and equity analysis.  Analysts and researchers generally use logarithmic returns instead of percent price changes because of various computational advantages.

63. The regression data are presented in Exhibit-7 and the regression results are presented in Exhibit-8.  The regression results show that Veeco's stock returns were significantly related to the returns of its peer group and to the overall stock market, but the stock also exhibited a substantial amount of independent movement.

**Isolating the Impact of Company-Specific Information**

64. The next step in the event study was to use the regression model to determine how much of Veeco's stock return on each of the event dates was driven by company-specific information as opposed to the market and peer group factors.  The method, which is generally accepted and widely used in econometric modeling, involves subtracting from each day's actual return the return that is explained by the market and peer group factors according to the regression model ("the explained return").  These computations, described in more detail next, are presented in Exhibit-9.

65. I computed the explained portion of Veeco's stock return on each event date by adding: 1) the estimated regression intercept term, 2) the respective day's S&P 500 Index return multiplied by the S&P 500 Index coefficient estimated by the regression, and 3) that day's peer group return multiplied by the regression's peer group coefficient.

21

66. Veeco's actual return on an event date, minus the explained return, equals the "residual return" for that date. The residual return measures how much of Veeco's return on the event date was caused by company-specific information and possibly by random volatility.

67. A statistical test, called a t-test, was then applied to determine whether the residual return can be explained by random volatility, or alternatively must have been caused by company-specific information.

**Event Study Results**

11 February 2005

68. On 11 February 2005, the S&P 500 Index return was 0.71% and the peer group index return was 3.57%.[3] According to the regression results, the explained portion of Veeco's stock return on any particular day equaled 0.004%, plus a coefficient of 0.669 times the S&P 500 Index return, plus a coefficient of 0.715 times the peer group index return. Inputting the market and peer group returns for 11 February 2005 into this model gives an explained return for Veeco stock of 3.03% on that day. However, the actual return of Veeco that day was -10.62%. The difference between the actual and explained returns, -13.65%, is the residual return for Veeco, the portion of the return that is unexplained by the market and peer group effects.

69. A residual return of -13.65% is an exceptionally large negative return. This -13.65% residual return is associated with a t-statistic value of -6.71. This t-statistic indicates that it is extremely unlikely that the decline in Veeco's stock price on 11 February 2005 was caused only by random volatility, the overall stock market, or a peer group effect. The likelihood of obtaining such an extreme residual return and associated t-statistic given this explanation is virtually nil (far less than one chance in a billion).

---

[3] As noted above, all returns in this analysis are quoted on a logarithmic return basis.

The residual return is therefore statistically significant.

70. The magnitude of the residual return and its statistical significance indicate that to a high degree of statistical certainty, the company-specific information disclosed to the market before the open and during trading on 11 February 2005, caused the Veeco stock price to fall 13.65% (on a logarithmic return basis) on 11 February 2005.

71. Given the $18.86 per share previous closing price for Veeco stock, a -13.65% logarithmic residual return translates into a decline of $2.41 per share caused by the company-specific information disclosed that day. This $2.41 share price decline represents 12.8% of the previous trading day's closing price.

72. According to the regression model, had it not been for the company-specific information impacting the stock price on 11 February 2005, Veeco stock would have risen 51 cents that day. Both the peer index and the overall market index had positive returns which should have boosted Veeco stock. Because Veeco stock fell $1.90 on 11 February 2005 instead of rising 51 cents, the impact of the company-specific information was to reduce the value of Veeco stock by $2.41 per share.

73. Because the Company-specific news on 11 February 2005 was primarily about the accounting problems and restatement, this disclosure, which was corrective of previous misrepresentations and omissions, is what eroded the per share value of the stock by $2.41 on 11 February 2005.

14 February 2005

74. On 14 February 2005, the S&P 500 Index return was 0.08% and the peer group index return was 0.34%.[4] According to the regression results, the explained portion of Veeco's stock return that day was 0.30%. However, the actual return of Veeco that

---

[4] As noted above, all returns in this analysis are quoted on a logarithmic return basis.

day was -4.58%.  The difference between the actual and explained returns, -4.89%, is the residual return for Veeco, the portion of the return that is unexplained by the market and peer group effects.[5]

75. A residual return of -4.89% is an exceptionally large negative return and is statistically significant.  The –4.89% residual return is associated with a t-statistic value of -2.40.  This t-statistic indicates that it is extremely unlikely that the decline in Veeco's stock price on 11 February 2005 was caused only by random volatility, the overall stock market, or a peer group effect.  The likelihood of obtaining such an extreme residual return and associated t-statistic given this explanation is only 1.7%, far below the generally accepted 5% probability level to establish statistical significance.

76. Given the $16.96 per share previous closing price for Veeco stock, a -4.89% logarithmic residual return translates into a decline of $0.81 per share caused by company-specific information.

77. Because there was no negative Company-specific news on 14 February 2005 other than analysts' reaction to the 11 February 2005 announcement, I conclude that the residual stock price return on February 14th was caused by the February 11th announcement, which was corrective of previous misrepresentations and omissions. It is that corrective disclosure that caused the price of Veeco stock to fall $0.81 on 14 February 2005.

78. Clearly, based on the empirical behavior of Veeco's stock price following the Company's announcement on 11 February 2005, the misrepresentations and omissions that were corrected by the disclosure were material.  The previous misinformation had inflated the stock price by $3.22 per share and the corrective disclosure caused the price to fall $3.22 per share.

---

[5] Slight arithmetic discrepancy is due to rounding.

24

**STOCK PRICE INFLATION RIBBON**

79. A stock price inflation ribbon is a time series indicating how much the stock price was inflated by the alleged fraud on each day over the class period.

80. While the event study analysis indicates that the artificial inflation in Veeco's stock price just prior to the corrective disclosure had reached $3.22 per share, it is not immediately apparent when that inflation first entered the stock price.

81. Because the accounting irregularities masked the low gross profit margins and unprofitability of the TurboDisc division, and those root problems were cited by equity analysts as reasons for the stock decline, it is reasonable that had the deeper problem been known to investors at the outset of the class period, the stock price would have declined by the full $3.22 at that point in time.

82. Moreover, had investors known about the low profit margins and unprofitability in the TurboDisc division as of the start of the class period, when first quarter 2004 results were announced, it is reasonable that investors would have been able to forecast the correct (lower) gross margin, operating income, and pre-tax income for the second and third quarters as well. Consequently, the full impact of the 11 February 2005 disclosure on the stock price that transpired on 11 February and 14 February 2005 would have transpired instead on the first day of the class period, if there had been accurate disclosure on that day of the true financial condition of the division and Company.

83. Similarly, to the extent that some of the price decline was caused by the discovery that Veeco suffered from deficiencies in its financial controls and reporting processes, had these problems been known to investors at the start of the class period, the stock price would have dropped at that time by the same amount this information caused the stock price to fall following the corrective disclosure after the end of the class

25

period. It is well documented in the finance literature that quality and reliability of financial data is a determinant of a company's security valuation.

84. It is therefore reasonable to conclude that the price of Veeco stock was inflated by the full $3.22 per share over the entire course of the class period.

85. However, to provide a conservative estimate of inflation and damages, I have applied an alternative model to estimate when the $3.22 per share artificial inflation entered the Veeco stock price. To provide a conservatively estimated stock price inflation ribbon, I assumed the inflation entered the stock price in amounts proportional to the cumulative pre-tax income overstatement reported as of each reporting date in the class period. That is, because the income overstatement grew each quarter, I assumed the inflation grew as well.

86. Of the $10.206 million aggregate pre-tax income overstatement, $2.800 million, or 27.4%, had been reported as of 26 April 2004, the first day of the class period. A cumulative overstatement of $7.076 million, or 69.3% of the ultimate total, was reported as of 26 July 2004. The remaining overstatement of $3.130 million on 25 October 2004 brought the total overstatement up to 100% of the ultimate aggregate total of $10.206 million.

87. Based on this model, which is conservative, I conclude that the stock price was inflated by $0.88 per share on 26 April 2004, which is 27.4% of the ultimate $3.22 per share inflation. The stock price was inflated by $2.23 per share on 26 July 2004, which is 69.3% of the ultimate $3.22 per inflation. The stock price inflation reached $3.22 per share by 25 October 2004.

88. Because the Company offered guidance prior to each earnings announcement date, one could reasonably conclude that the inflation entered the stock price somewhat earlier than the dates of the actual announcements. However, to be conservative

26

again, I assumed that the inflation entered the stock price not on dates early guidance was provided, but on the actual earnings announcement dates.

89. Exhibit-10 presents the stock price inflation ribbon.

### PER SHARE DAMAGES

90. Rule 10b-5 damages on any shares purchased during the class period equal the lesser of the reduction in the dollar inflation over an investor's holding period (the economic/inflation loss) or the decline in the stock price (the investment loss). If either the inflation or price increased over the holding period for any particular share, that share was not damaged, so the damage for that share is zero.

91. For Rule 10b-5 damages, shares sold within 90 calendar days of the 11 February 2005 corrective disclosure, are assumed to have been sold for a price equal to the average closing price over the period from 11 February 2005 to the actual sale date. Shares sold later than the 90-day period commencing on 11 February 2005 (that is, after 11 May 2005), or never sold, are assumed to have been sold for a price equal to the average closing price over the 90 calendar days from 11 February 2005 to 11 May 2005. That 90-day average price for Veeco was $14.57 per share.

92. For example, suppose an investor purchased Veeco shares on 3 January 2005 for $20.44 per share and sold those shares on 12 May 2005 for $13.58 per share. Though the actual selling price was $13.58 per share, for purposes of computing damages in accordance with the 1995 PSLRA 90-day rule, the selling price is assumed to be the average of the closing prices over the period from 11 February 2005 through 11 May 2005, which was $14.57 per share.

93. The inflation on 3 January 2005 was $3.22 per share, while there was no inflation on 12 May 2005. This investor's economic/inflation loss on those shares is $3.22 per

share (the initial inflation of $3.22 minus the $0 inflation on the sale date). The
investment loss is $5.87 per share (the $20.44 purchase price minus $14.57 assumed
selling price). The Rule 10b-5 damage is therefore $3.22 per share, the lesser of these
two numbers.

94. Based on the foregoing analysis and statutory formulas, damages per share range
from $0 to $3.22 per share, excluding interest, depending on when each share was
purchased and sold. Any investor who sold during the class period – that is, on or
after 26 April 2004 but prior to 11 February 2005 – would have suffered no damages
on those shares. Among those investors who suffered the highest per share damage,
$3.22 per share, are those investors who bought shares during the class period after
the inflation had reached $3.22 per share (by 25 October 2004), at a purchase price of
$17.79 or more, and held those shares longer than 90 calendar days beyond the end of
the class period.

## PREJUDGMENT INTEREST

95. If lead plaintiff and the class are awarded prejudgment interest, damages for each
investor would equal the per share damage described above plus interest on that
amount.

96. Exhibit-11 presents interest computations up to the date of this report (23 March
2007) for each potential selling date within the 90-day period following the corrective
disclosure and for the case of investors who either sold after 90 days beyond the
corrective disclosure or who never sold. The exhibit computes interest using a 6%
simple interest rate. This table can be modified depending on what prejudgment
interest rate the court determines to be appropriate.

97. By way of example, consider the investor who purchased shares on 3 January 2005
and sold those share on 12 May 2005. Damages were computed above to be $3.22

per share as of the sale date.  Interest from 11 May 2005 (the assumed sale date for damage computation purposes, as it is 90 days after the corrective disclosure) to 23 March 2007 accruing at the 6% simple rate amounts to 11.2%.  Consequently, total damages for that investor, inclusive of interest, would be $3.58 per share, which is $3.22 times 1.112 (1 plus aggregate interest).

## CONSERVATIVE ASSUMPTIONS

98.  The methodology and assumptions I employed in the inflation and damage computations were conservative, resulting in reduced estimates of inflation and damages.

### Positive News in 11 February 2005 Press Release Countervailed Against the Negative News, Reducing the Price Impact

99.  In addition to the announcement in the 11 February 2005 press release and conference call that there had been accounting irregularities and that the Company planned to restate earnings, the press release and conference call conveyed some countervailing good news.

100.  For example, the press release also stated that fourth quarter 2004 orders were better than had previously been expected and that market conditions had improved:

> "Fourth quarter orders were $99 million, up 2% from the prior year fourth quarter and up 24% sequentially.  The Company's fourth quarter order guidance was $85-$95 million.
> …
> "Market conditions improved for Veeco during the fourth quarter, with orders up 24% sequentially to $99 million, driven primarily by increased capital spending from our data storage and semiconductor customers."
> **"Veeco Provides Financial Update; Postpones Earnings Release Pending Internal Investigation of TurboDisc Accounting," Company press release, Business Wire, 11 February 2005.**

29

101. Additionally, in the conference call, the Company announced aggressive plans to cut costs and improve profit margins.

102. The stock price reaction to the bundle of news was a decline of $3.22 per share. However, this figure does not factor out the impact of the good news from the bad news about the accounting and restatements. Because the good news must have had some countervailing positive impact on the price, the impact of the bad news must have been worse than the overall $3.22 per share decline.

103. To be conservative, however, I did not increase the estimated inflation by the estimated impact of the countervailing good news. I do, however, note that due to my conservative assumptions and methodology, the $3.22 per share inflation is a conservatively low estimate of the inflation caused by the alleged fraud.

**Attribution of None of the 12 October 2004 Profit Warning Residual Price Decline to Alleged Fraud**

104. I treated as unrelated to the alleged fraud all of the information conveyed to the public in the profit warning issued on 12 October 2004, and I excluded from my computation of inflation all of the price drop that followed that warning.

105. It is possible, however, that some of the price decline on 12 October 2004 was dissipation of artificial inflation that was caused by the Company's prior misrepresentations and omissions. Had investors been more completely informed about the Company's financials and the operating condition of the TurboDisc division, they may have better understood the risk of the poor performance that caused the reduced earnings and thus the profit warning.

106. Moreover, my understanding is that evidence has been produced in this case indicating that some of the reduction in orders and sales was due to a worsened competitive situation faced by Veeco on account of component quality and spare

parts availability problems that the Company knew about but did not disclose to investors.

107. Consequently, some of the more than 18% price decline that followed the 12 October 2004 profit warning could have occurred sooner if the Company had been more forthcoming.[6] Therefore, though I did not treat it as such, some of that price decline may have been dissipation of fraud-induced inflation.

108. To be conservative, however, I treated this event as if it were unrelated to the alleged fraud. This conservative treatment results in a substantially lower estimate of inflation and per share damages.

**Private Information Discovery**

109. My methodology only attributes statistically significant price declines to alleged fraud if those price declines are accompanied by public news that constitutes a corrective disclosure of the alleged fraud.

110. It is certainly possible, however, that some price declines occurred when private research turned up information that called into question management's representations.

111. Nonetheless, my methodology omits from the estimation of inflation and damages those price declines that may have been caused by non-public information, even if that information may have been corrective of fraud-related misinformation.

**The Alleged Fraud May Have Caused More of Veeco's Overall Price Decline**

112. Veeco's stock price fell $10.54 per share from its peak price of $26.74 during the

---

[6] The stock price decline over the two trading days following the 12 October 2005 profit warning was 18.0% on a percent price change basis and 19.9% on a logarithmic return basis.

class period to $16.20 by 14 February 2005. Based on my methodology and assumptions, I attribute less than 1/3 of this decline to fraud-induced inflation and correction.

113. If some of the price decline on 12 October 2004 had been dissipation of fraud-induced inflation, for example, or if there had been non-public discovery of some of the information concealed from the public during the class period, some of the additional price decline may actually have been dissipation of inflation caused by the alleged fraud.

114. Because it attributes to dissipation of fraud-induced inflation none of these additional possible sources, my methodology is inherently conservative, and provides a conservatively low estimate of inflation and damages.

**Protracted Decline in Veeco Stock Price Following the Class Period**

115. After falling on 11 February and 14 February 2005, Veeco's stock price continued to slide downward. By 12 May 2005, the stock price had declined an additional 16.2%, or $2.62 per share, from $16.20 per share to $13.58 per share. It is possible that some of this decline was caused by a protracted reaction to the 11 February 2005 announcement, by later analyst opinions informed by the announcement, or by follow-on disclosure events such as the actual restatement that occurred on 16 March 2005.

116. However, my methodology conservatively excludes the later decline in price from inflation and damages.

117. Because of the level of random volatility in Veeco's stock returns, to be considered statistically significant, a residual stock price decline would have to be -4.01% or worse. It is possible, however, that some fraud-related inflation

dissipated on days after the class period on which the share price movements were more moderate than that threshold. Consequently, it is likely that my methodology understates damages by not including inflation that may have dissipated on other days over the 90 days during which Veeco stock continued to slide.

### Conservative Damage Computation

118. In general, because I used a conservative methodology and adopted conservative assumptions, my damage computations are conservatively low.

## RESULTS AND SUMMARY

119. Event study analysis indicates that the earnings overstatements described in the Complaint caused Veeco's stock price to be inflated during the class period by amounts ranging from $0.88 per share to $3.22 per share.

120. The corrective disclosure before the open of trading on 11 February 2005 had a $3.22 negative impact on the market price of stock over the subsequent two trading days.

121. Consequently, I estimate that damages caused by the fraud alleged in the Complaint, suffered by investors on shares of Veeco stock purchased over the period from 26 April 2004 to 10 February 2005, range between zero and $3.22, depending on when the shares were purchased and sold.

122. Aggregate prejudgment interest accruing up to the date of this report, computed at an assumed statutory 6% simple interest rate is a minimum of 11.2%, depending on when each particular investor sold his or her Veeco shares or continued to hold those shares.

123. I may revise or amend my analyses as new information becomes available.

## LIMITING FACTORS AND OTHER INFORMATION

This report is furnished solely for the purpose of court proceedings in the above named matter and may not be used or referred to for any other purpose. In accordance with recognized professional ethics, my professional fees for this service are not contingent upon the opinions expressed herein. I am being compensated at the rate of $575 per hour for this work. I have no present or intended financial interest in the outcome of this matter. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report, including in the event additional information becomes available.


Steven P. Feinstein, Ph.D., CFA